J-S06016-20

2020 PA Super 155

| | | |
|---|---|---|
| LYNDA BOWMAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAND SPEAR & ASSOCIATES, P.C., | : | No. 1245 EDA 2019 |
| SPEAR & GREENFIELD, P.C., SPEAR, | : | |
| GREENFIELD & RICHMAN, P.C., | : | |
| SPEAR, GREENFIELD, RICHMAN & | : | |
| WEITZ, P.C., RAND SPEAR, | : | |
| ESQUIRE, MARC F. GREENFIELD, | : | |
| ESQUIRE, AND STUART A. RICHMAN, | : | |
| ESQUIRE | | |

Appeal from the Judgment Entered April 10, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  July Term, 2016, No. 00298

BEFORE:  LAZARUS, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

OPINION BY McLAUGHLIN, J.:                                    **FILED JULY 06, 2020**

In this legal malpractice action, Lynda Bowman appeals from the judgment entered in favor of Rand Spear & Associates, P.C., Spear & Greenfield, P.C., Spear, Greenfield & Richman, P.C., Spear, Greenfield, Richman & Weitz, P.C., Rand Spear, Esquire, Marc F. Greenfield, Esquire, and Stuart A. Richman, Esquire (collectively "Spear"). Spear represented Bowman in an underlying suit arising from a vehicle accident in a parking lot owned by Glimcher Development Corporation ("Glimcher"). In the malpractice action, Bowman claimed that Spear committed malpractice by failing to institute suit against Glimcher before the statute of limitations expired.

The malpractice case proceeded to a jury trial and ended in a nonsuit. Bowman now claims the trial court committed four errors: concluding that Glimcher could not be subject to liability under Restatement (Second) of Torts §§ 323 and 324A, entering a nonsuit when doing so was against the weight of the evidence, failing to grant a motion for recusal, and failing to grant Bowman's motion for a new trial. We affirm.

The underlying accident occurred in June 2000, when a truck driven by Shirley Lake struck the car in which Bowman was a passenger. Bowman hired Spear to represent her and they instituted a lawsuit on Bowman's behalf against Lake. Lake then joined several additional defendants, including the company she alleged was owner of the parking lot, K-Mart Corporation ("K-Mart"). Lake allegedly later learned that Glimcher was the "true" owner of the parking lot and joined Glimcher as an additional defendant. However, she effected the joinder after the statute of limitations on Bowman's claims had allegedly expired. *See* Complaint, filed 7/6/16, ¶¶ 36-39, R.R. 108a-109a. At no time in the underlying suit did Spear assert a claim against Glimcher on Bowman's behalf.

K-Mart then entered bankruptcy and the bankruptcy court reduced Bowman's claim against K-Mart to zero. At that point, the bankruptcy stay prevented further action in the case until the parties stipulated in 2014 to K-Mart's dismissal. Bowman ultimately settled the underlying case for $150,000, far less than Spear had allegedly promised.

Bowman instituted this suit in July 2016, asserting that Spear's failure to assert a direct claim against Glimcher before the statute of limitations expired deprived her of her right to recover from all responsible parties. The case proceeded to a jury trial in November 2018. Prior to trial, the court held a hearing on pre-trial motions, including Spear's motion to bifurcate the trial of the underlying case from the trial of the malpractice allegations. Spear maintained that before the jury could address the malpractice allegation, Bowman first had to establish the "case within a case," that is, that Glimcher was liable to Bowman for damages related to the 2000 accident. Before Bowman stated her position, the court stated:

> No, you've convinced me. I am going to listen to the other side.
>
> I also think it makes for a much simpler verdict sheet and jury instruction for me to instruct them first with regard to the underlying motor vehicle accident, have them reach a decision in that regard, and then come back on the malpractice aspect of the case.
>
> Giving it all to them at the same time with a convoluted verdict sheet and instruction – it's already "If you say yes, then go to this question. If you say no, go to this question." It just gets more complicated if you try to combine the case-within-the-case.
>
> But I'll listen to whatever your argument is.

N.T., 11/2/18, at 9-10.

Bowman then responded that bifurcation was not warranted because issues in the underlying case overlapped with those in the malpractice suit. *Id.* at 11. She argued that evidence to support the underlying case no longer

- 3 -

existed because Spear failed to get such evidence during discovery in the underlying case, and Spear's negligence therefore limited her ability to prove the case-within-a-case. *Id.* at 12. Bowman referred to a Pennsylvania Supreme Court case but did not have a copy for the trial court. The court instructed counsel to provide the court with copies of cases that they cited:

> Here's the way it works in here. And you haven't been here before, so no problem.
>
> I often tell lawyers, "I'm not interested in Smith on Evidence. I'm sure, Mr. Smith, you've done a nice job describing the law, but I can't cite you to the Superior Court. I have to cite a case."
>
> I need to see a case, not just your thoughts on a case. And when you give me the case, you should use a yellow highlighter and give me the 30 or 40 words that you think compel me to decide in your favor. That way I know exactly what you're relying on and whether or not I think I can rely on it.

*Id.* at 10. Although Spear had previously mentioned one case without providing a copy to the court, and without the court requesting a copy, *id.* at 7, Spear later cited cases and provided copies of those cases to the court. *See e.g. id.* at 17.

During the ensuing discussion, the court directed Bowman's counsel not to interrupt opposing counsel and gave further directions on courtroom behavior:

> THE COURT: What's the likelihood that there will be a no-liability finding?
>
> [Spear's Counsel]: Very high.
>
> [Bowman's Counsel]: That's for the jury.

[Spear's Counsel]: Because the –

THE COURT: You can have a seat.

[Bowman's Counsel]: I apologize.

THE COURT: And let's get the rules straight right at the outset. Nobody interrupts anybody, especially me.

And you should sit too.

I don't have rules in here about standing and sitting. If you want to stand and speak, that's fine. If you want to sit, that's fine, make use of the microphone. But there is no interrupting.

So you were saying.

*Id.* at 25-26. The court granted the motion and bifurcated the trial.

The court and parties then discussed other motions *in limine*. When denying motions filed by Spear to preclude testimony regarding an allegedly missing stop sign, the court commented that Bowman's case was weak: "It's weak, but it's her defense to the underlying motor vehicle accident." *Id.* at 65. It further stated that "[t]here's nothing wrong with the plaintiff introducing weak evidence, but evidence nevertheless, that there was a stop sign and for some reason that day, it wasn't there." *Id.*

At one point during the hearing, the court made reference to Spear's television commercials:

[Bowman's counsel]: Your Honor, the only issue – and I explained this to [Spear's counsel] – is that Ms. Bowman may testify that the way she came to Mr. Spear was seeing a TV commercial of him. That's it.

THE COURT: I don't want to venture to guess how many people on this jury already know that Rand's the man.

> I mean, he's all over TV all the time, so I can't imagine there being an objection to her testifying that she saw the TV commercial or she saw a website or –
>
> . . .
>
> THE COURT: She went to a lawyer. If it comes up, she went to a lawyer. Everyone will look over and say she must have gone to Rand the man.

*Id.* at 55-56.

The court also addressed Spear's motion to preclude the testimony of Bowman's expert. The court initially granted the motion. *Id.* at 103. The court revisited the motion the following day and heard additional argument from counsel. The court concluded that "[t]he fact that we're struggling over this so much makes me think that it should be . . . up to the jury to decide whether they believe this expert or not and what exactly he's saying." N.T., 11/5/18, at 19. It then vacated its prior order and allowed the testimony, concluding that Spear's arguments went to the weight of the testimony. *Id.* at 25.

Before jury selection, Bowman made an oral motion for recusal of the trial judge. In support, she noted that the court had called Spear "Rand the man"; said Bowman's evidence was weak; reprimanded counsel for not giving it a copy of a case; admonished counsel by telling counsel to sit down when counsel interrupted defense counsel; and indicated that it had decided the bifurcation motion before hearing Bowman's arguments. *Id.* at 149-56. The court denied the motion. *Id.* at 156.

Bowman's counsel stated on the record that he believed that the trial court mentioned the "Rand the man" commercial to a potential juror during

jury selection. N.T, 11/7/18, at 8. After Bowman received the transcript of jury selection and reviewed it, she believed it to be incomplete because it did not contain the alleged remark. She contacted the court reporting company and claimed that the transcript failed to contain everything that occurred. N.T., 3/11/19, at 13. The trial court conducted a hearing at which the court reporter testified that after her employer informed her of the call, she listened to the transcript again, and did not hear the "Rand the man" remark alleged to be missing. *Id.* at 11. She further testified that she did not intentionally leave anything out of the transcript and that the court had not instructed her to do so. *Id.*

When the trial commenced, Bowman presented a video of Lake's deposition testimony.[1] She testified that she had been shopping at Sam's Club and drove to K-Mart, which was the next store. N.T., 11/6/18, at 9; Reproduced Record at 768a. She testified that she stopped at the stop sign and, after she stopped and looked to her right and left, she "was going to start out going straight." *Id.* at 10. She stated that she saw the vehicle Bowman was in "come in at that red light," and it seemed to her "that [the driver] was coming pretty fast for a parking lot, and [] came down and around and disappeared behind" fertilizer bags that had been piled up. *Id.* at 10-11. Lake

---

[1] The certified record does not contain the transcript for the portion of the November 6, 2018 proceedings containing Lake's deposition and the *voir dire* of expert Julius Pereira. The reproduced record does contain a copy, and because the parties not dispute its accuracy, we may consider it. *See Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012).

said she then proceeded forward, at which point the accident occurred. *Id.* at 11.

Lake testified that a stop sign had previously controlled Bowman's lane of travel: "You know what, I remember I've been there before and there had been signs up and then they got knocked over and then they got replaced." *Id.* at 21. She stated, however, that, if a stop sign had been there on the day of the accident, she would have been able to see it. *Id.* at 22. She presented a picture of posthole on the corner, which she testified previously held a stop sign. *Id.* at 26. She then testified that, "[I]t was just down all the time." *Id.* at 27. When asked whether she expected Bowman's car to stop, Lake said, "I was not cognitively at that time thinking that he was going to stop. I just knew I had stopped and I proceeded. I wasn't thinking about him. I was thinking - - I was upset that he didn't put his brakes on and that he sped up." *Id.* at 34. She further testified, "I lived in that area for 17 years, Levittown, and I've seen stop signs at that corner, and I've seen stop signs missing at that corner. There's nothing left but a stick." *Id.* at 35.

Bowman testified at trial that on the day of the accident, she and her family were going to a barbecue at her mother's house. N.T., 11/7/18 (morning session), at 12. Her then-husband[2] was driving, she was in the passenger seat, and her children were in the back seat. *Id.* at 12-13, 17. She testified that they turned into a shopping center, "came down a road and

---

[2] At the time of the accident, her husband was Charles Costello. They had divorced prior to the trial in the legal malpractice action.

entered a four-way intersection, and off to the right was K-Mart." ***Id.*** at 13. She stated that they proceeded through the intersection, "[t]here was no stop sign," and "[t]hen that's when we were hit" by Lake. ***Id.*** She testified that at the time Lake's lane of travel had a stop sign at the intersection. ***Id.*** at 27. Bowman testified that the lane of travel that her husband was traveling did not have a stop sign. ***Id.*** at 13, 36.

On cross-examination, Bowman testified that she visited her mother often, and took the route through the shopping center on occasion. ***Id.*** at 69-70. When asked if she knew whether there previously had been a stop sign at the intersection, she said she "never took notice of [a stop sign]." ***Id.*** at 71. When asked whether Lake stopped at Lake's stop sign, Bowman responded, "I can't answer for her. At that time – it was 18 years ago – I thought she did not because she hit us." ***Id.*** Bowman stated that when she noticed Lake's truck would collide with their car, she said, "She's not stopping. She's going to hit us." ***Id.*** She stated that, "[a]t that time," she believed that the accident occurred because Lake did not stop at her stop sign. ***Id.*** at 72.

During the cross-examination of Bowman, the trial judge asked questions of Bowman, and Bowman's counsel objected:

> THE COURT: I'm sorry. I just don't understand. What difference does it make whether there's a stop sign for you or not when you're talking about Ms. Lake blowing her stop sign, no longer controlling her car?
>
> And you keep going back to you didn't have a stop sign.
>
> You didn't have a stop sign, so your husband didn't do anything wrong. He was just driving through.

But you sued Ms. Lake, alleging that she did all these things. How has that changed? She didn't blow the stop sign, didn't lose control [of] her car, and wasn't driving in a negligent way?

THE WITNESS: That's what I thought back then. I don't know if that's what she did or not.

BY [Spear's counsel]: Q. You also verified as a true statement that Ms. Lake failed to keep adequate distance from other vehicles in the --

[Bowman's counsel]: Objection.

Q. -- of her vehicle; is that right?

[Bowman's counsel]: Your Honor, could we have a sidebar for a moment?

THE COURT: What's the basis for your objection?

[Bowman's counsel]: We would appreciate making the comments outside the presence of the jury.

THE COURT: We'll just wait until he's done. Have a seat.

[Spear's counsel]: Your Honor, it was your reaction to Ms. Bowman's testimony.

THE COURT: I'm just trying to understand what she's testifying to. She keeps saying "At the time. At the time. At the time. Now I know something different."

What she knows different now is that -- or she thinks she knows -- she didn't have a stop sign. Her husband drove through the intersection and didn't stop because he didn't have a stop sign.

How does that change what she said with regard to Ms. Lake? That's what I'm trying to find out. I don't understand her answers.

[Bowman's counsel]: She has answered that question, Your Honor. I don't want to speak for her, but she answered that specific question during counsel's questioning already.

I'm happy to either have the court reporter read it back or state my understanding of it, but she was asked this question and answered it.

THE COURT: Did she respond to your question? I didn't hear a response to the question. She keeps talking around in circles.

[Spear's counsel]: No. Exactly. I just want to know about Ms. Lake's behavior. Ms. Lake is – doesn't get away from the requirement to observe a stop sign or obey a stop sign.

THE COURT: Do you understand counsel's question?

THE WITNESS: Yes.

THE COURT: Okay.

[Spear's counsel]: Q. I mean, you haven't learned anything to indicate that Ms. Lake didn't have a stop sign, did you?

A. She had a stop sign.

Q. Okay. And there's nothing that leads you now to believe that your car had a stop sign at that time.

A. My car did not have a stop sign.

Q. At that time, without any stop sign in your direction, you had the right of way, or your husband had the right of way. Is that right?

A. Well, that's what I thought, yes.

Q. Is there something you know now that is different about whether your husband's car had the right of way in that intersection?

A. Well, we didn't have a stop sign so we proceeded.

Q. And that's because your car had the right of way.

A. Because we didn't have a stop sign.

*Id.* at 81-84.

Following Bowman's testimony, Bowman moved for a mistrial, citing the court's questioning of Bowman. The court granted the motion:

- 11 -

> [Bowman's counsel]: Your Honor, we wanted to put on the record our objection to your questioning of our witness, your characterization of her testimony as talking around in circles, nodding your head incredulously as she answered some of the questions, and your editorializing about her responses.
>
> We feel this is unfair prejudice against our client and our case. We're just asking for a fair trial with the jury.
>
> THE COURT: So what would you like me to do?
>
> [Bowman's counsel]: We move for a mistrial.
>
> COURT: Granted.
>
> Earlier you wanted one. Now he wants one, so it is granted.
>
> [Spear's counsel]: Well, I withdrew mine. I withdrew mine.

*Id.* at 90-91.

When the proceedings resumed, the court stated that, while the proceedings were off the record, Spear had requested reconsideration and Bowman requested recusal. N.T., 11/7/18 (Motion for Recusal), at 4. Bowman explained she was seeking the judge's recusal because of his allegedly "leading questions" and "editorializing," and his alleged reference to "Rand the man" in front of a potential juror:

> [Bowman's counsel]: [Bowman was testifying] about the accident and why she thought Ms. Lake was initially responsible for it, and, of course, she repeated at that time -- and I don't remember exactly what the Court asked. I didn't write it down, but I do know that after you asked the question, at one point you leaned back and, in my estimation, you rolled your eyes, and the eight jurors were sitting here looking at the Court and our witness, and then, also, another question you asked: You said, well, she's talking in circles and we said you were editorializing.
>
> And then aside from that, in front of a juror on Monday you, again, said Rand The Man –

- 12 -

THE COURT: In front of a juror? Are you going back to your original motion of my recusal?

[Bowman's counsel]: Well, no –

THE COURT: We were ten minutes into this trial, you were asking me to recuse myself, and the explanation I gave at that time I stand by and, based on that explanation, I deny that motion.

[Bowman's counsel]: Okay. Well, I wasn't revisiting what we said on Friday. I was talking about Monday. When we were doing *voir dire* in the back and you were trying to remember Mr. Spear's last name and then you said I'm so used to calling him Rand The Man, that would be –

THE COURT: Which juror is that?

[Bowman's counsel]: I don't remember.

THE COURT: Well, is she sitting on the jury or not?

[Bowman's counsel]: I don't know.

THE COURT: Well, what difference does it make if she's not on the jury?

[Bowman's counsel]: Well, I don't know what she went and told other jurors.

THE COURT: Well, did you ask to *voir dire* her about that?

[Bowman's counsel]: No, I did not, but I'm bringing it up now.

THE COURT: Right, in a desperate attempt to remove me from the case. There's no basis in fact or in law.

[Bowman's counsel]: Your Honor, Rule 2.1 of the Code of Judicial Conduct states: A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might be reasonably questioned. So going back to Friday where you mentioned -- you said Rand The Man at least three times on the record --

THE COURT: But I still don't understand why referring to him the way he's referred to in his TV commercials, the way that I think both sides wanted me to *voir dire* the jury about

- 13 -

the TV commercials, how referring to him in that way is in any way prejudicial to the plaintiff.

[Bowman's counsel]: You're not saying that Lynda's the woman. You're saying Rand's The Man.

. . .

THE COURT: I don't remember ever saying everyone knows Rand's The Man. I would say everyone knows Rand The Man, because Rand The Man is like Ron Levitt sells creampuffs. Do you remember that one? But there are a lot of commercial slogans that catch the air, okay, and Rand The Man is one of them.

[Bowman's counsel]: You also characterized our case as weak.

THE COURT: You do have a weak case. And, as I explained to you the first time you made this motion, I'm not deciding your case. The jury decides your case. I only decide the legal issues, and if I'm wrong on the legal issues, the Superior Court can correct that.

It just grows weaker the more I hear. I said it was a weak case based on the various conflicting testimony you had about the presence of a stop sign and when the stop sign disappeared, but since then I've learned more about your expert, and since then I've heard more about the evidence of the accident, and I know maybe super[s]eding intervening cause is a doctrine that has disappeared when I was over in criminal court, but to me it sounds like a super[s]eding cause that Ms. Lake entered the intersection based on faith that a car she could no longer see was going to stop at a stop sign that she couldn't see. So, yes, I think you have a very weak case, but I'm not doing this as a nonjury trial.

. . .

[Bowman's counsel]: Your Honor, whether or not you decide the case is a legal question that may be brought in front of you, and that you characterized our case on Friday before hearing any of our evidence we felt like showed a partiality of bias and there's no reasonable basis to say that.

- 14 -

You also said this case is just a fender-bender, and I think you said that twice on Friday. Again, I don't have the transcript, so I'm doing it from my own recollection. And what I do recall is that you said that and then I felt like there was a smirk, and that [Spear's counsel] also had a smirk when you said that. . . .

THE COURT: Said what?

[Bowman's counsel]: That this is just a fender-bender.

THE COURT: I don't remember saying this was a fender-bender.

[Bowman's counsel]: Well, the record will reflect if that was said, Your Honor. We're just looking for a fair trial, and we're not saying you can't be fair in every case. We just feel like in this case given these circumstances that recusal would be warranted, especially because we feel that we have a reasonable basis to question your ability to be impartial, and there is case law to support the position that we're taking. Appearance of impropriety provides sufficient to warrant a recusal –

. . .

THE COURT: Well, that's what it's all about. I mean, I understand the Hornbook law that if there's the appearance of bias, the Court should recuse, but I don't see where there's any appearance of bias. I explained to you everything you objected to.

[Bowman's counsel]: We understand you feel like you're not bias[ed], Your Honor, but we feel like you're biased.

THE COURT: It's not a question of your feelings.

[Bowman's counsel]: And our client feels like you're being biased.

THE COURT: It's not a question of her feelings. It's an objective standard: What did I do to indicate a bias? And I can't see anything from what you've told me that indicates a bias. Saying that you have a weak case doesn't mean I'm ruling against you, in fact, when we did the motions *in limine* – I don't know if they're evenly split, but you won some and you lost some. At least in one case I reconsidered, I think

- 15 -

you won that one. It doesn't change the fact that you have a weak case.

[Spear's counsel]: And I lost one today.

THE COURT: And I'm not keeping score. I mean, but I also have an obligation as managing this courtroom to encourage the sides to talk from time to time to see if the case can be settled and one way of doing that is reminding people from time to time that they have problems with the case.

I'm reminding the defense: You have a problem with this case. I'm reminding you: You have a problem in your case. Part of your problem is your expert but there are other problems as well.

So I don't think I've done anything that demonstrates any kind of a bias and so I'm going to reconsider my motion with regard to mistrial. If you think the jury needs to be told something, write out a proposed jury instruction, and I'll tell them something to correct whatever you think needs to be corrected, and I'm not going to recuse myself.

[Bowman's counsel]: Your Honor, we'd like to look at the transcript and then brief this, because we do feel like there's a basis for it, not just based on my memory but on the record itself. And we feel like your comments to the jury cannot be cured by a curative instruction.

THE COURT: What comment?

[Bowman's counsel]: That she's talking in circles and then you also rolled your eyes, Your Honor.

THE COURT: I never roll my eyes, so I don't know what you're talking about.

[Bowman's counsel]: No, I'm sorry. You shook your head incredulously is actually how I described it earlier today and you did, in fact, do that, Your Honor.

THE COURT: Did you see me do any of that?

[Spear's counsel]: Your Honor, I did not. I honestly did not. You turned towards the witness –

THE COURT: No, no, just state that I didn't do it.

- 16 -

[Bowman's counsel]: Your Honor, we asked for a sidebar at that exact moment which you denied. You said no and then counsel tried to explain to you why we're asking for a sidebar. That's not the basis for the recusal, but we're saying that you shook your head incredulously like you didn't believe what she was saying and then you followed it up with saying she's talking in circles. That is a pejorative summary from our client's testimony. That is unfair to our client.

THE COURT: Your motion is denied. You'll have a chance to raise it again.

N.T., 11/7/18, at 7-18.

The trial then resumed. Bowman presented the testimony of a real estate property specialist with Sears Holdings Company, Catharine Masters. Masters explained that Sears Holding Company is an umbrella corporation and K-Mart is one of the companies under the umbrella. N.T., 11/8/18 (Morning Session), at 98-99. She testified that at the time of the accident, K-Mart had a lease with the owner of the property where the accident occurred. She said that in 1973, when the lease originated, the owner of the property was Developers Diversified Services. According to Masters, Glimcher later became the owner, and was the owner at the time of the accident, shortly after the accident, the lease was assigned to an unrelated company, Gator Investments. *Id.* at 99-101, 104.

Bowman also presented the testimony of an expert, Julius Pereira, III. The parties conducted an extensive *voir dire* of Pereira's qualifications to provide expert testimony in this case. 11/6/18, at 37-95; Reproduced Record at 796a-853a. Pereira testified that generally, an owner is responsible for

maintaining a property. N.T., 11/8/18, at 9. It was his understanding that at the time of the accident, Glimcher was the owner of the property that contained the intersection in question and was responsible for the maintenance of the property. *Id.* at 13-14. Such maintenance would include maintaining safe conditions and various "features" on the property, including signage. *Id.* at 14. He testified that if a stop sign was missing, the owner would need to replace it. *Id.* at 15. He said that owners are obligated to inspect the property and the frequency of inspection "depends upon the particular component, but in general at least once a year, as a general rule." *Id.* at 16. On cross-examination, he testified that there was nothing in the lease between Glimcher and K-Mart that imposed on Glimcher the responsibility of maintaining the signs. *Id.* at 68.

At the end of Bowman's case, Spear moved for a nonsuit. They argued that the evidence Bowman had presented, even taken as true, was insufficient to prove every element of her underlying case against Glimcher. The court granted the motion. Bowman filed a post-trial motion, seeking removal of the nonsuit and a new trial. The court denied the motion and entered judgment in Spear's favor. Bowman timely appealed.

Bowman raises the following issues:

> A. Whether the trial court committed reversible error when it ruled that the landowner could not be subjected to liability under Restatement (Second) of Torts §§ 323 and 324[A].[3]
>
> B. Whether the trial court erred in granting [Spear's] motion for non-suit because the weight of the evidence was in [Bowman's] favor.
>
> C. Whether the trial court erred when Judge Cunningham failed to recuse himself despite a record reflecting that the court was unable to be impartial and was biased and when it incorrectly reversed the its (sic) own grant of mistrial.
>
> D. Whether the trial court erred in failing to grant [Bowman's] motion for a new trial.

Bowman's Br. at 6 (unnecessary capitalization omitted).

## I. Nonsuit – Liability of Glimcher

In her first two claims, Bowman contends that the trial court erred when it granted Spear's motion for nonsuit. She argues that Glimcher is subject to liability under Restatement (Second) of Torts §§ 323 and 324A, and that she presented evidence of every element of her claim: the parking lot was held open to the public; Bowman was a member of the public; Glimcher assumed responsibility for the maintenance of the traffic control devices; a fourth stop sign was missing; the missing stop sign was a safety issue that Glimcher had a contractual duty to remediate; Glimcher should have known the sign was missing; Lake had traveled through the intersection many times and was aware a fourth stop sign controlled the lane in which Bowman travelled; and

---

[3] Although Bowman sometimes references Restatement (Second) of Torts § 324, her argument addresses Section 324A, not Section 324.

Lake relied on her knowledge that a stop sign was there when she entered the intersection.

Bowman also claims that Glimcher owed Bowman a duty of reasonable care because she was using land that appeared to be a public highway. She cites the Restatement (Second) of Torts § 367, relating to dangerous conditions on land appearing to be a highway, and argues that Glimcher breached the duty of care set forth in that section.

"A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief." **Scampone v. Highland Park Care Ctr.**, 57 A.3d 582, 595 (Pa. 2012) (citing Pa.R.C.P. No. 230.1(a), (c)). We will affirm the entry of a compulsory nonsuit "only if no liability exists based on the relevant facts and circumstances, with appellant receiving 'the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor.'" **Id.** at 595-96 (quoting **Agnew v. Dupler**, 717 A.2d 519, 523 (Pa. 1998)) (alteration in original).

To state a cause of action for negligence a "plaintiff must demonstrate: (1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff." **Farabaugh v. Pa. Turnpike Comm'n**, 911 A.2d 1264, 1272-73 (Pa. 2006).

The trial court first concluded that, for purposes of the nonsuit, Bowman was an invitee onto the land. It then noted that a landowner has an affirmative

duty to protect a business visitor against known dangers and against dangers that "might be discovered with reasonable care." Trial Court Opinion, filed Aug. 19, 2019, at 6 ("1925(a) Op.") (quoting **Emge v. Hagosky**, 712 A.2d 315, 317 (Pa.Super. 1998)). It quoted the Restatement (Second) of Torts § 343, which provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343.

The trial court reasoned that, to establish Glimcher was liable, Bowman had to establish that a missing stop sign at the intersection created an unreasonably dangerous condition on the property that Glimcher realized people on the property would not discover because it was not obvious. 1925(a) Op. at 6-7. The court concluded there was "no evidence that the lack of one stop sign in a four-way intersection creates an unreasonably dangerous condition." *Id.* at 7. The court reasoned, "[o]ne missing sign in a four-way intersection doesn't create a hazard all by itself as long as everybody else is stopping." *Id.* (quoting N.T., 11/8/18 (afternoon session), at 19).

The court further concluded that the accident "was not caused by the absence of a stop sign." *Id.* Rather, it was caused by Lake not obeying her stop sign. *Id.* The court reasoned that there was no obligation to include a four-way stop sign at every intersection, and no evidence supported the contention that a four-way stop sign was needed at the intersection. *Id.* The court further noted that Bowman presented no evidence that Glimcher "did not inspect the property within one year of the accident, as [Bowman's] expert testified was their duty for reasonable care." *Id.*

The court further addressed the argument that Lake "detrimentally relied upon [Bowman's] car stopping where [Bowman] believes a stop sign should have been." *Id.* It concluded that Lake's testimony contradicted this theory, noting Lake testified that "(i) she was aware that the alleged stop sign was 'down all the time,' (ii) . . . her view was not obstructed as to where the stop sign would have been, and (iii) . . . she 'was not cognitively at that time thinking that [Bowman's car] was going to stop.'" *Id.* at 7-8 (quoting N.T., 11/6/18 (afternoon session), at 22, 27, 34). The court further noted that Bowman presented no expert testimony "on the human factors aspect – no evidence that someone who has driven through the intersection would rely on a former stop sign." *Id.*

The trial court concluded:

> Even when all reasonable inferences are viewed in the light most favorable to the Plaintiff, no reasonable juror could conclude, based on the evidence at trial, that Glimcher acted unreasonably. The evidence is insufficient to establish that it was unreasonable to not have a stop sign there, whether

it was knocked down or intentionally removed. As the Court counseled [Bowman], "What you need is an expert who says that, for whatever reason, he can cite some construction code like BOCA, some other statute or regulation, but for some reason, on some theory, this intersection in the shopping center is a dangerous intersection unless you have a stop sign there." [N.T. 11/9/18, at 9] [Bowman] was unable to produce such evidence. Nonsuit was proper.

*Id.* at 8.

We conclude that the trial court's entry of nonsuit was proper. As the trial court noted, Bowman failed to establish that an unreasonable dangerous condition existed and that Glimcher knew, or should have known, of the condition.

Bowman also contends the court should have applied three different sections of Restatement (Second) of Torts – Section 323, Section 324A, and Section 367. However, even if the trial court had applied those sections, Bowman still would not have been entitled to relief.

Section 323 provides that a person is liable if, among other things, that person undertakes to render services that he or she should recognize as necessary to protect others and fails to exercise reasonable care in performing the undertaking:

> One who undertakes, gratuitously or for consideration, to render services to another which he **should recognize as necessary for the protection of the other's person or things**, is subject to liability to the other for physical harm resulting from **his failure to exercise reasonable care to perform his undertaking**, if
>
> (a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (emphasis added). Similarly, Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he **should recognize as necessary for the protection of a third person or his things**, is subject to liability to the third person for physical harm resulting from **his failure to exercise reasonable care to protect his undertaking,** if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A.

Here, as the trial court explained, Bowman did not present evidence that a fourth stop sign was necessary for the protection of those using the intersection. Rather, Bowman appears to have assumed that such was the case. Nor was there evidence that Glimcher failed to act with due care. Although Bowman's expert testified that Glimcher had a duty to maintain the stop signs, including a duty to inspect the property at least once a year, there was no evidence of a breach of such duties. Bowman presented no testimony as to when the sign was removed, or any evidence that Glimcher knew, or should have known, that any stop sign was missing.

Nor does Section 367 afford Bowman an avenue for obtaining relief. That section requires findings that the individual failed to exercise reasonable care and failed to maintain a road in a reasonably safe condition for travel:

> A possessor of land who so maintains a part thereof that he knows or should know that others will reasonably believe it to be a public highway is subject to liability for physical harm caused to them, while using such part as a highway, by his **failure to exercise reasonable care to maintain it in a reasonably safe condition for travel.**

Restatement (Second) of Torts § 367 (emphasis added).

As with Sections 323 and 324A, Bowman did not present evidence to support liability under Section 367. Bowman did not present sufficient evidence to support a finding that Glimcher failed to exercise reasonable care to maintain the "road" through the parking lot in a reasonably safe condition for travel. In sum, Bowman failed to establish Glimcher was liable for any injury caused by the accident under any of the theories she offers.

## II.    Motion for Recusal

Bowman next claims the trial court erred in denying her motion for recusal. She claims the trial court "went into and along with the matter with a prepared conclusion regarding the case's merits, and commented on defense counsel's notoriety and fame with implications of praise and admiration." Bowman's Br. at 24. She claims the court's comments regarding her case, and its actions during trial, "were intemperate, and raise an appearance and inference of bias." *Id.* at 25. She stated that the "bias presents a substantial doubt as to [the trial court's] ability to preside impartially." *Id.* Bowman

references statements by the trial court that she claims establish bias. She cites its referring to the "Rand the man" commercials, calling Bowman's case weak, reprimanding Bowman's counsel for interrupting, telling her counsel to provide cases to support his legal theories, and deciding motions against Bowman before hearing Bowman's argument.

This Court reviews the denial of a motion to recuse for an abuse of discretion. *Lomas v. Kravitz*, 170 A.3d 380, 389 (Pa. 2017). "An abuse of discretion is not merely an error of judgment, but occurs only where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record." *Id.* (quoting *Zappala v. Brandolini Prop. Mgmt., Inc.*, 909 A.2d 1272, 1284 (Pa. 2006)).

"A party seeking recusal must assert specific grounds in support of the recusal motion before the trial judge has issued a ruling on the substantive matter before him or her." *Rohm and Haas Co. v. Cont'l Cas. Co.*, 732 A.2d 1236, 1261 (Pa.Super. 1999) (citation omitted). "[R]ecusal is required wherever there is substantial doubt as to the jurist's ability to preside impartially." *Id.* (citations omitted). Further, "because the integrity of the judiciary is compromised by the appearance of impropriety, a jurist's recusal is necessary where [the judge's] behavior appears to be biased or prejudicial." *Id.* (citing *Commonwealth v. Benchoff*, 700 A.2d 1289 (Pa.Super. 1997)).

However, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not

constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Commonwealth v. Kearney*, 92 A.3d 51, 61 (Pa.Super. 2014) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Although a trial court should normally leave the questioning of witnesses to counsel, it has "the right if not the duty to interrogate witnesses in order to clarify a disputed issue or vague evidence." *Jordan v. Jackson*, 876 A.2d 443, 453 (Pa.Super. 2005) (quoting *Mansour v. Linganna*, 787 A.2d 443, 446 (Pa.Super. 2001)). A new trial based on a court questioning of a witness will not be granted "[u]nless the complaining party can establish the judge's questioning constituted an abuse of discretion, resulting in discernible prejudice, capricious disbelief, or prejudgment." *Id.* at 454 (quoting *Mansour*, 787 A.2d at 446).

The trial court found that Bowman's claims regarding the court's influence on the jury were moot, because the jury did not decide the case. It further concluded that Bowman failed to produce evidence to establish bias, prejudice, or unfairness, either against Bowman or in favor of Spear. 1925(a) Op. at 9.

The trial court first addressed Bowman's contention that the court showed bias by referring to Spear as "Rand the man." It noted the references occurred out of the presence of the jury and referred to television commercials for the law firm. *See* N.T., 11/2/18, at 55-56. The trial court concluded that any reference to "Rand the man" clearly referred to the advertising campaign, and was not an endorsement of Spear:

- 27 -

Rand Spear has implemented a notorious legal advertising campaign in the Philadelphia area over the past three decades. One of Spear's taglines in his ads is "Rand's the man." [Bowman] took issue with the Court referring to [Spear] as "Rand the man," when the Court, under the assumption that jurors would be familiar with Spear, stated, "I don't want to venture to guess how many people on this jury already know that 'Rand's the man,' I mean, he's all over TV all the time." (N.T., 11/2/18, at 55). The Court explained "I've seen the commercials . . . I think he says or the voiceover keeps saying, 'Rand the man.'" (N.T., 11/2/18, at 149). Any reference to [Spear] as "Rand the man" is clearly an allusion to his many advertisements and not an endorsement of his character. Further, the Court did not refer to [Spear] as "Rand the man" in front of the jury. Even if it had, as discussed below, the jury did not decide this case, so it is a moot point.

1925(a) Op. at 10 (citation formatting provided).

The trial court next addressed Bowman's claim that the court showed bias when ruling on the motion to bifurcate. It noted that it heard argument from both parties before deciding to bifurcate the legal malpractice claim and the underlying motor vehicle action. It stated that "[Bowman's] contention that the Court did not hear [Bowman's] argument on this issue is patently false, as the Court specifically stated, 'I'll listen to whatever your argument is,' and heard [Bowman's] extensive 'overlapping of issues' argument." 1925(a) Op. at 11 (citing N.T., 11/2/18, at 10-29). It explained that because of the "case-within-a-case" aspect of the trial, it "found that bifurcation was appropriate to avoid confusion to the jury and to promote an expeditious resolution of the cases." *Id.* The court explained that it made for a "much simpler verdict sheet and jury instruction[s]" and that "[g]iving it all to them at the same time with a convoluted verdict sheet and instruction . . . . It just

gets more complicated if you try to combine the case within the case." **Id.** at 11-12 (citing N.T., 11/2/18, at 9-10). The court reasoned that "ruling against a party does not make the judge biased and [it] will not entertain such an argument." **Id.** at 12.

The court next addressed Bowman's claim that it was biased because it called her case "weak." The court acknowledged that it did, out of the jury's hearing, call Bowman's case weak. 1925(a) Op. at 12. The court noted that in calling her case weak it "was simply highlighting to [Bowman] the issues with her case." **Id.** It was not "keeping score," but did have an "obligation as managing th[e] courtroom to encourage the sides to talk from time to time to see if the case can be settled and one way of doing this is reminding people from time to time that they have problems with the case." **Id.** at 12 (quoting N.T., 11/7/18, at 16). The court explained that Bowman "had issues with [her] witnesses' conflicting testimony and [her] expert's failure to establish a safety issue." **Id.** It concluded that calling her case weak was "not a biased statement, but an objective one based on the facts presented at trial." **Id.**

The court also addressed Bowman's claim that the court was biased because of its demeanor during Bowman's testimony. The court noted that counsel accused the court of rolling its eyes, but later recanted this statement and Spear's counsel stated it never happened. 1925(a) Op. at 12-13. As to the court's statements during Bowman's testimony asking whether Bowman responded to a question and noting that "[s]he keeps talking around in circles," the court noted that Bowman "repeatedly appeared to dodge

answering questions regarding Ms. Lake proceeding through her stop sign." *Id.* at 13. It noted that "there were at least fourteen times in which [Bowman] responded to the effect of 'that's what I thought at the time but I don't know now.'" *Id.* (quoting N.T., 11/7/18 (morning session), at 77-81). It also noted that Bowman "stated five times that she's not sure if Ms. Lake ever proceeded through her stop sign, which is antithetical to the basis of her lawsuit." *Id.* at 13. The court stated that "[t]he entire exchange was confusing and illogical and the Court accurately described [Bowman] as 'talking around in circles.'" *Id.* It then "questioned [Bowman] to make sure she understood the questions being asked." *Id.* It concluded that its comments "were accurate and appropriate." *Id.*

The court concluded that Bowman "was unable to produce any evidence establishing bias, prejudice, or unfairness which raised a substantial doubt as to the Court's ability to preside impartially." 1925(a) Op. at 14. It stated that it "bent over backwards" for Bowman, pointing out that it had allowed her expert to testify, despite reservations, but that "when all was said and done, when you rested, we were left with a record where I just couldn't find that you had made out a case." *Id.* at 14-15 (quoting N.T., 3/11/19, 28-29). The court continued, "[a]nd that is not the result of bias. That's the result of giving you every opportunity." 1925(a) Op. at 15 (quoting N.T., 3/11/19, 28-29). The court concluded it appropriately did not recuse itself.

We conclude that the court did not abuse its discretion in concluding Bowman failed to establish that recusal was necessary. As the trial court

noted, its reference to "Rand the man" referred to a commercial, was not in front of the jury, and was not any kind of endorsement. Further, that the court may have seemed inclined to grant the motion to bifurcate prior to hearing Bowman's argument does not establish bias. Neither does its statement that Bowman's case was weak indicate bias. The court's frank assessment of Bowman's case, away from the jury, is not evidence of bias. Indeed, as the trial court pointed out, it gave her the opportunity to prove her case. Further, the court's questioning of Bowman in no way rose to the level of establishing prejudice, bias, or ill will. The court's questions were reasonable efforts to bring clarity to confusing testimony. Even considering the trial in totality, Bowman has failed to carry her burden to establish substantial doubt about the trial court's ability to preside impartially.

### III.  Motion for New Trial

In her final claim, Bowman maintains the trial court erred in denying her request for a new trial. She claims the trial court applied an incorrect standard to her theory of the case. She claims her theory was based on the common law theory of a negligent/gratuitous undertaking, under the Restatement (Second) of Torts §§ 323 and 324A. She argues that, under these sections, once Glimcher erected a stop sign, it had a duty to "consider the possible reliance by some member of the traveling public on that traffic control" and "maintain its highway in a manner to protect travelers from dangers that could be anticipated and avoided." Bowman's Br. at 27 (citation and internal quotation marks omitted). She argues that Pennsylvania requires the "non-

negligent maintenance of discretionary duties voluntarily assumed." *Id.* at 29. She argues that her expert did not need to opine that a four-way stop sign was the only way to make the intersections safe. Rather, because Glimcher gratuitously undertook to add a four-way stop sign, it had to exercise reasonable care to protect this undertaking because drivers rely upon the traffic control devices there.

We apply the following standard of review to a court's decision to deny a motion for a new trial:

> We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion. We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. If the alleged mistake concerned an error of law, we will scrutinize for legal error. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.

*Gbur v. Golio*, 932 A.2d 203, 206–07 (Pa.Super. 2007) (citations and quotation marks omitted).

Bowman's claim fails for the same reasons discussed above. Even assuming Glimcher had a duty to maintain the stop sign, Bowman provided no evidence that Glimcher failed to act with reasonable care. There is no evidence that Glimcher knew the stop sign was not there, and no evidence that it reasonably could have known through the exercise of due diligence.

Judgment affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/6/20