J-A19020-22

2023 PA Super 2

V.L.-P.                                    :    IN THE SUPERIOR COURT OF
                                           :         PENNSYLVANIA
                    Appellee               :
                                           :
            v.                             :
                                           :
S.R.D.                                     :
                                           :
                    Appellant              :    No. 477 MDA 2022

            Appeal from the Order Entered February 18, 2022
            In the Court of Common Pleas of Lebanon County
            Domestic Relations at No(s):  2020-5-0545


BEFORE:   BOWES, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY KING, J.:                          **FILED:  JANUARY 6, 2023**

        Appellant, S.R.D., appeals from the order entered in the Lebanon

County Court of Common Pleas, denying his petition for genetic testing.  We

affirm in part and vacate and remand in part for further proceedings consistent

with this decision.

        The trial court set forth the relevant facts and procedural history of this

case as follows:

> [V.L.-P. ("Mother")] is the biological mother of A.D.
> [("Child")].  In early 2008, [the parties] were engaged in an
> "on-again, off-again" relationship.  Both parties
> acknowledge that they engaged in sexual intercourse on
> February 3, 2008, which was Super Bowl Sunday.  [Mother]
> denied that she had sex with anyone else during the two
> months before and the two months after Super Bowl
> Sunday.  [Appellant] presented a witness[, G.H.,] who
> proclaimed that her brother and [Mother] spent a great deal
> of time together and spoke about being engaged during

---

[*] Former Justice specially assigned to the Superior Court.

February of 2008.

When [Mother] discovered that she was pregnant, she notified [Appellant] "because he is the father." [Appellant] attended pre-natal ultrasounds and expressed some excitement about becoming a father. At no time during pregnancy did [Mother] relate that anyone else could possibly be the father of her unborn child.

[I]n October…2008, [Mother] gave birth to an infant daughter[, Child]. [Appellant] was notified and he was permitted to be present in the hospital at the time of birth. Both [Appellant] and [Mother] acknowledge that a conversation occurred regarding paternity. Although the details of the conversation are disputed, both [Appellant] and [Mother] agree that [Mother] assured [Appellant] that only he could be the father. Based upon this representation, [Appellant] signed an acknowledgment of paternity and [Child] was given his last name.

Starting six (6) months following birth, [Appellant] began enjoying alternating weekend periods of time with his daughter. As [Child] grew, [Appellant] attended doctor's appointments, parent-teacher conferences, and athletic events involving [Child]. Almost every night, [Appellant] telephoned or FaceTimed [Child]. These communications inevitably ended with "I love you" being expressed by both [Appellant] and [Child].

[Appellant] is a part of a close extended family. [Appellant's] family embraced [Child] as one of their own. During twelve years leading up to 2020, [Child] developed a close relationship with [Appellant's] parents, who were called "Mimi and PopPop," [Appellant's] sister "Auntie M" and [Appellant's] grandfather, "Pappy Beers."

In early 2020, [Appellant] and his wife [K.D.] became involved with Ancestry.com. They presented DNA to Ancestry. Both [Appellant] and [K.D.] professed surprise when the Ancestry.com analysis was received and [Child] was not mentioned as being part of their family tree. According to [Appellant], "[Child's] Ancestry profile did not match either me or anyone else in my family…I was shocked."

Prior to April of 2020, [Appellant] paid roughly $400 per month in voluntary child support. He stopped paying in May of 2020. [Appellant] testified that his cessation of support was due to COVID-driven unemployment and not the Ancestry.com information. In fact, [Appellant] testified that he had a difficult time believing the Ancestry.com test results. [Appellant's] custody rights with respect to [Child] were expanded to equal 50-50 periods of time between May and September of 2020. During this period of time, [Appellant] did not mention or question paternity.

With the advent of in-person school in September of 2020, [Mother] again undertook primary physical custody of [Child] and [Appellant] returned to an alternating weekend schedule. However, [Appellant] did not pay any child support. Eventually, on November 16, 2020, [Mother] filed a Complaint Seeking Child Support against [Appellant].

[Following Thanksgiving weekend in] November of 2020, [Appellant] confronted [Mother] about the Ancestry.com paternity information. [Mother's father] and [K.D.'s mother] were present…when the disclosure about the Ancestry.com information was accomplished. [Mother] testified that [Appellant] said: "Had you not sued me for support, I would have taken the information [about paternity] with me to my grave." [Appellant] denied making such a statement. [Mother's father] corroborated [Mother's] version of the conversation. Everyone agrees that [Mother] continued to assert that [Appellant] was the only man who could be the father of [Child.]

Following the conversation between [Mother] and [Appellant] about paternity, the parties' relationship understandably deteriorated. [Appellant] testified that [Mother] withheld contact with [Child]. [Mother] denies that she withheld contact. [Appellant] did acknowledge that after November 30, 2020, he declined to have telephone contact with [Child]. As summarized by the subsequently-appointed [guardian *ad litem* ("GAL")], "There were a few instances where brief communication occurred between [Child] and [Appellant] after November 30, 2020. By and large, however, their telephone communications ceased. Indeed, the nightly telephone or FaceTime contacts stopped

altogether." In fact, the GAL documented that [Appellant] would hand over his telephone to other relatives whenever [Child] called him following November 30, 2020.

According to [Child], her relationship with [Appellant] underwent a "radical transformation" following November of 2020. At some unknown time, [Appellant] told [Child] that he may not be her biological father. According to [the GAL], [Child] "understands that [Appellant] is denying paternity for her based upon the Ancestry.com/Ancestry DNA results."

[Appellant] did enjoy physical custody of [Child] on Christmas of 2020. [Appellant] described the visit as "rough." In addition, [Appellant] acknowledged that he requested custody rights with [Child] on New Year's Eve/Day. According to [Appellant], [Mother] refused to give him custody of [Child] at any time during the New Year's holiday. Since Christmas of 2020, [Appellant] has not exercised any physical custody rights with [Child]. However, [Appellant] acknowledged that he sent an email on December 31, 2020 within which he asked for a resumption of alternating weekend periods of physical custody. Those weekend visits were never re-initiated.

In February of 2021, [Appellant's] grandfather, Pappy Beers, passed away. Because [Child] was especially close to Pappy Beers, she was invited to his funeral. [Child] attended the funeral and sat with "Auntie M." According to witnesses, very little interaction occurred between [Appellant and Child] during the funeral or the subsequent reception. Following the funeral, no further contact occurred between [Child] and [Appellant].

[Appellant] testified that he no longer considers himself to be [Child's] father. According to [Appellant], he did not really reach the conclusion that he was not [Child's] father until January of 2021. In addition to the Ancestry.com test results, [Appellant] indicated that he received information in October that [Mother] suffered from chlamydia when [Child] was born. [Appellant] indicated that he never contracted chlamydia and he attributed this [sexually transmitted disease] to [Mother's] sexual contact with the true biological father of [Child]. In addition, [Appellant]

received information through Ancestry.com from a woman by the name of [G.H.] [G.H.] testified that [Mother] and her brother were "close" to one another in February of 2008. In fact, [G.H.] believed that her brother and [Mother] may have been engaged at that period of time. According to [G.H.], her family has a history of suffering from a connective tissue disorder. [Child] was described as having a problem with connective tissue in her knee.

[Appellant] testified that he asked [Mother] to take a DNA test. He testified: "If [Mother] believed I was the father, then do the DNA test and let's be done with this." According to [Appellant], it was the confluence of all of the above information (the Ancestry test, the chlamydia, the connective tissue disease and [Mother's] refusal to consent to genetic testing) that caused him to reach the conclusion in January of 2021 that he was not [Child's] biological father. At that point, he cut off all contact with [Child].

[Mother] acknowledged that she would not consent to genetic testing. She explained that genetic testing would be "traumatic" for [Child], but she could not explain precisely how or why such trauma would flow from testing.

[Appellant] raised a question about paternity with the [c]ourt for the first time on December 18, 2020. The [c]ourt refused [Appellant's] invitation to order genetic testing based exclusively upon a written petition.[1] Instead, on December 21, 2020, the [c]ourt scheduled a hearing for the purpose of determining whether genetic testing should be [c]ourt-ordered.

[1] When [Appellant's] Motion was provided to the [c]ourt, we quickly perceived that the child in question was 12-years of age and that a Child Support dispute had recently been filed. Given these facts that were apparent from the record, we were unwilling to issue an immediate order to direct that genetic testing be undertaken.

On March 1, 2021, [Appellant] filed an Amended Request for Genetic Testing in which he raised an allegation of fraud against [Mother]. Following the March 1[, 2021] Amended Request for Genetic Testing, a Lebanon County Domestic

- 5 -

Relations Master (DRM) issued a recommendation and report regarding child support. Based upon the parties' respective incomes, the DRM recommended that [Appellant] pay $766.18 per month in child support. This was roughly $350 more than what [Appellant] had been paying prior to 2020. On March 16, 2021, this jurist met with both parties and both counsel. After a lengthy discussion, it became obvious that the parties were not in agreement as it related to the concept of genetic testing or the process by which it could be ordered. Because of this, the [c]ourt ordered both parties to file briefs.

Because this jurist refused to simply order genetic testing based on [Appellant's] request, [Appellant] filed a Motion to Recuse this jurist on April 5, 2021. This motion was denied on April 7, 2021.

Both [Mother] and [Appellant] filed briefs regarding the genetic testing issue. On April 27, 2021, this [c]ourt issued a 16-page Opinion. In that Opinion, we set forth our analysis of what we described as a "morass of Pennsylvania Paternity by Estoppel law." Because we concluded that Paternity by Estoppel requires a court to analyze the best interests of the child involved, we decided to appoint a [GAL] to represent the interests of [Child].

On April 27, 2021, we formally appointed [a] GAL for [Child]. [The GAL] is a licensed attorney who left the legal profession in order to launch a career as a family counselor. [The GAL] has served as GAL in numerous Lebanon County custody proceedings. He was asked by this [c]ourt to undertake an analysis with respect to whether disestablishment of paternity would be in the [best] interest of [Child].

[The GAL] began his assignment by reaching out to both counsel and both parties. As was his assigned role, [the GAL] attempted to focus upon [Child] and her interests. This was difficult to accomplish with [Appellant], because he was myopically focused upon the issue of fraud and his own self-victimization.

[The GAL] issued a formal report on June 28, 2021. As instructed, his report focused upon how disestablishment of

- 6 -

paternity would affect [Child]. (To his credit, the GAL did not accept [Appellant's] invitation to detour into the issue of fraud.) In focusing upon his assignment, [the GAL] met with the parties and [Child]. He described [Child] as an intelligent and focused young lady. He stated that [Child] was "confused" about how and why her relationship with "Dad" had changed so dramatically. [The GAL] described the emotion and tears shed by [Child] and he concluded that she has genuine love for [Appellant] and is suffering emotional pain as a result of what occurred in 2021. Ultimately, [the GAL] concluded that disestablishment of paternity would **not** be in the interest of [Child].

Following [the GAL's] report, [Appellant] filed objections and asked this [c]ourt to strike the report from the record. This [c]ourt refused to grant [Appellant's] motion.

The Factual Hearing was commenced on July 20, 2021. In accordance with our Opinion of April 27, 2021, we permitted [Appellant] to articulate and present evidence regarding his theory of fraud. Of necessity, the fraud-related testimony delved into [Mother's] sexual and romantic history. In addition, we instructed the parties to focus upon the best interests of [Child]. As it related to that topic, we directed that [the GAL] provide sworn testimony in [c]ourt subject to cross-examination by both parties.

A Factual Hearing could not be completed on July 20, 2021. After several COVID-related postponements, the factual testimony relevant to our decision was completed on January 31, 2022. …

(Trial Court Opinion, filed 2/18/22, at 2-10) (internal citations omitted) (emphasis in original).

At the July 20, 2021 hearing, Appellant testified that he was in a casual relationship with Mother prior to Child's birth. Appellant was not aware if Mother was having any intimate relationships with other men while she was intimate with Appellant. On February 3, 2008, Appellant and Mother had sex.

- 7 -

Appellant remembered the date because it was Super Bowl Sunday. In mid-to-late June 2008, Mother told Appellant she was pregnant with his child. Mother said Appellant was the only possible father. Mother reassured Appellant multiple times leading up to Child's birth that he was Child's father. Based on Mother's representations, Appellant testified that he never had a reason to question paternity. Appellant attended some pre-natal appointments with Mother. After Child's birth while at the hospital, Appellant had to sign various forms including an acknowledgment of paternity form. Prior to signing, Appellant again asked Mother if he was the only possible father. Mother assured Appellant that he was the only possible father. Mother stated that if Appellant did not sign the form, then she would not let Child have his last name. Appellant signed the form based on Mother's assurances.

Appellant placed Child on his health insurance plan, but Mother made most healthcare decisions regarding Child. Mother and Appellant lived approximately 45 minutes away, and although Appellant visited with Child after her birth, the visits were not regular. Appellant attended some of Child's well visits. Eventually, after consulting with a lawyer, Appellant obtained partial physical custody. In 2015, Mother got married to J.P. ("Ex-Husband"), whom she divorced in 2016. Prior to their marriage, Appellant observed that Ex-Husband was regularly involved in Child's life. After Mother's divorce from Ex-Husband, Ex-Husband no longer played a role in Child's life.

In the beginning of 2020 when Appellant was working from home during

the pandemic, he exercised more custodial time with Child. Since the time Child could talk, Appellant tried to speak to her on the phone as many days as possible. Once Child had her own phone, Appellant and Child frequently had FaceTime calls. Over the years, Appellant felt a lot of push-back from Mother if Appellant tried to express an opinion regarding Child that was not aligned with Mother's view.

In the spring of 2020, Appellant learned that he might not be Child's biological father. Appellant's stepson's father was adopted, and Appellant was helping his stepson conduct a family tree project through Ancestry.com to learn more about his heritage. The Ancestry.com results[1] did not reveal Child as part of Appellant's familial matches. Instead, the test showed a close family relation between Child and G.H. G.H. is someone who Appellant knew of in the area. Initially, Appellant believed the test must be mistaken. Appellant spent the next couple of months trying to verify the accuracy of the results.

In April or May of 2020, Appellant stopped paying child support, which Appellant had paid voluntarily since Child's birth. Appellant had job changes due to the pandemic and was under financial stress. In late summer or fall of 2020, Mother filed for child support. During the week after Thanksgiving in 2020, Appellant brought up the Ancestry.com results to Mother. Appellant

_____

[1] The court did not admit the results of the Ancestry.com test for the truth of the matter asserted regarding paternity but merely to demonstrate Appellant's state of mind after reading the results.

was anxious to approach Mother on the topic because he anticipated an argument. When he presented Mother with the Ancestry.com results, Mother maintained that Appellant was Child's father. Mother denied knowing anyone with the last name shared by G.H.

Following the conversation, on December 3, 2020, Appellant e-mailed Mother and proposed obtaining private genetic testing to confirm or deny the accuracy of the Ancestry.com results. Mother said she would only proceed through the court system. Mother also said that she was not comfortable letting Appellant visit with Child following the discussion regarding the Ancestry.com results. Mother permitted Child to see Appellant for a couple hours on Christmas, but Mother distanced Child from Appellant regarding their otherwise regularly scheduled visits.

Around December 2020 or January 2021, Appellant obtained medical records showing that Mother had chlamydia during her pregnancy, and Mother was admitted to the hospital in September 2008 for treatment. Appellant was unaware that Mother had this infection during her pregnancy. Appellant testified that he has never had chlamydia to his knowledge, and he would have insisted on a DNA test to confirm paternity had Mother disclosed this infection.

Appellant maintained this his relationship with Child is now non-existent. Appellant no longer holds Child out as his own in the community. After the visit on Christmas, Child removed personal belongings from Appellant's home.

After Christmas, Child attended the funeral of Appellant's grandfather, with whom Child was very close. Other than that event and the luncheon following the funeral, Appellant has not seen Child.

On cross-examination, Appellant admitted that he sought shared custody in the summer of 2020 even after receipt of the Ancestry.com results. At that point, Appellant still doubted the accuracy of the test results and believed he was Child's father. (*See* N.T. Hearing, 7/20/21, at 5-114). The court concluded the hearing following Appellant's testimony, to resume at a later date. The court further ordered that pending a final decision in the case, all future support payments paid by Appellant were to be held in escrow by the Domestic Relations office.

The hearing continued on January 31, 2022. Mother testified at the hearing that at the time Child was conceived, she was in an "on-again, off-again" relationship with Appellant. Mother agreed she had sex with Appellant on February 3, 2008, which was Super Bowl Sunday. Mother said she also had sex with Appellant about a week before that date. Mother said she notified Appellant about the pregnancy a few months after discovering she was pregnant. Mother denied that Appellant ever questioned paternity prior to Child's birth. Mother denied pressuring Appellant into signing the acknowledgment of paternity after Child was born. Mother said that Appellant told her in the hospital at the time of Child's birth that his employer required a paternity test for health insurance documents. Mother responded that if

Appellant wanted to take a paternity test, then she would have given Child her last name (and not the last name of Appellant) on the hospital paperwork until the results came back. Appellant did not hesitate to sign the acknowledgment of paternity after this brief discussion. Mother maintained there was (and is) no reason to question paternity because Appellant is the only person with whom she was sexually active at the time Child was conceived. Appellant did not mention anything regarding paternity (aside from the health insurance requirement discussion) to Mother until November 30, 2020.

Beginning when Child was approximately six months old, Appellant and Mother had an informal custody arrangement whereby Appellant had custody every other weekend. Appellant also saw Child during the holidays and Child spent vacations with Appellant and his family. Appellant attended Child's medical and dental appointments. Appellant attended parent/teacher conferences every year. Appellant also attended some of Child's extracurricular activities. Mother said Appellant and Child spoke regularly on FaceTime.

On November 30, 2020, Appellant texted Mother indicating that he wanted to have a conversation with her. During the ensuing conversation, Appellant informed Mother that he had conducted an Ancestry.com project several months before, and no one in his family matched with Child as being a blood relative. Appellant told Mother that had she not filed for child support

two weeks prior, Appellant would have "taken it [the Ancestry.com results] to his grave." Mother did not believe the accuracy of the results because she insisted that Appellant is Child's father.

Mother testified that this situation has been tough on Child because she has not seen most of Appellant's family since January 2021. Child expresses to Mother that she misses Appellant and his family.

Mother explained that in May 2020, while Child's school was virtual during the pandemic, Appellant sought week-on/week-off custody. Mother agreed and this shared custody arrangement continued until the fall of 2020 when in-person education resumed. During this time, Appellant exercised the greatest amount of custodial time he had with Child since her birth. When in-person learning resumed, the custody arrangement went back to Appellant having every other weekend with Child, until Thanksgiving weekend.

Mother emphasized that she is certain Appellant is Child's father because she was not sexually active with anyone else during the relevant timeframe. Regarding the sexually transmitted infection, Mother claimed she contracted that from somebody else who she had been dating during her pregnancy, and Mother was treated for it at the end of July 2008. Mother explained she had been dating someone from June to August in 2008 while she was pregnant.

On cross-examination, Mother claimed that requiring Child to undergo a paternity test would not serve her best interest. Specifically, Mother testified that giving Child doubt about the status of paternity, when Mother is certain

- 13 -

Appellant is her father, would not be in Child's emotional best interest. Mother also stated that she does not know anyone with the last name shared by G.H., who was identified as a relative of Child in the Ancestry.com results. Mother admitted that she has a 2008 conviction for theft by unlawful taking, for which she served probation. Mother also admitted that she lost her driver's license around 2017; she did not notify Appellant of her license suspension. Mother maintained she had migraine issues around the time of her license suspicion so she would not have driven even if she had her license during that period. Mother maintained she never drove with Child when her license was suspended. Mother explained that Child would have to give up some activities if she would no longer receive child support payments from Appellant. (**See** N.T. Hearing, 1/31/22, at 5-78).

Appellant's wife, K.D., testified that Appellant was initially shocked by the Ancestry.com results. K.D. said that she and Appellant tried to verify the accuracy of the results, and they learned the results are 99.9% accurate. K.D. claimed Appellant was scared to discuss the results with Mother. When Appellant confronted her, Mother insisted Appellant is Child's father. K.D. denied that Appellant made the comment about taking the Ancestry.com results to the grave if Mother had not filed for child support. K.D. stated that the last time Appellant spent any meaningful time with Child was on Christmas Eve of 2020. K.D. said that Child's phone calls with Appellant and his family stopped in January of 2021.

K.D. testified that around 2017, Mother told K.D. and Appellant that she could not drive because of bad migraines. Appellant transported Child more often around that time. K.D. said that Mother still drove during the period when she complained of migraines but usually shorter distances. K.D. later learned Mother had been driving without a license.

K.D. testified that she no longer considers Child as part of their family. When K.D. and Appellant tell people how many children they have, they no longer count Child as one of their own. K.D. and Appellant specifically excluded Child from their wills and removed her pictures from their home. K.D. testified that Appellant believed he was Child's father until early 2021, when Appellant and K.D. received the medical records showing Mother's sexually transmitted infection, coupled with information from G.H. that Mother had a close relationship with G.H.'s brother around the time of conception, as well as Appellant and K.D.'s communications with Ancestry.com regarding the accuracy of results. At that point, Appellant and K.D. no longer believed Appellant was Child's father. (*See id.* at 79-123).

G.H. testified that she has an Ancestry.com profile and that her Ancestry.com results connect her with Child as "close family." G.H. stated that she knows Mother, as Mother was good friends with her brother, R.H. G.H. confirmed that Mother "hung out" at her brother's house approximately eight to ten years earlier. G.H. testified that Mother and R.H. were in a serious relationship around February 2008, and G.H. believed they were engaged to

be married.  G.H. explained that she has a genetic disorder called Ehlers-Danlos syndrome, which is a connective tissue disorder that causes frequent dislocations of joints.  (*Id.* at 124-136).

K.D.'s mother, M.Q., testified that Appellant and Child had a good relationship.  M.Q. treated Child like an adopted granddaughter.  M.Q. explained that Appellant had little authority concerning decisions over Child's activities and medical appointments, as Mother made the decisions and Appellant just had to accept them.  (*Id.*at 137-145).

Mother's father, K.L., Sr. ("Maternal Grandfather"), testified that he lives with his wife, Mother, and Child.  Maternal Grandfather was present when Appellant confronted Mother about the Ancestry.com results.  Maternal Grandfather overheard Appellant make the comment about taking the Ancestry.com results to his grave, but Maternal Grandfather could not recall the precise context of that statement.  Maternal Grandfather stated that Child had a very close relationship with Appellant and his family.  Maternal Grandfather indicated that Child misses Appellant and his family.  Maternal Grandfather has no recollection of Mother having a relationship with anyone named R.H.  (*Id.* at 145-161).

On rebuttal, Appellant testified that if he made the comment about taking the Ancestry.com results to his grave, that might have been his initial response to the situation.  Appellant clarified that after processing the information more deeply, he could not keep the truth bottled up if he is not

Child's biological father. Appellant explained that G.H.'s genetic connective tissue disorder sounds very similar to joint issues that Child has experienced, which had been attributed to sports injuries. Appellant claimed he saw Mother driving in 2017 when her license was suspended, around the time Mother had been complaining of migraines. Appellant stated that his mother-in-law, M.Q., discovered that R.H. is a mutual Facebook friend of hers through Mother. In other words, Facebook showed that Mother and R.H. are connected as friends on social media.

Appellant testified that he began to reduce communication with Child in January of 2021 because he did not want to confuse her or cause her more emotional harm until the truth is determined. Appellant claimed that when he met G.H., he believed her nose looked extremely similar to Child's nose. (*Id.* at 161-174).

On rebuttal, Mother confirmed that she does not know G.H. or R.H. Mother denied that she was engaged to R.H. in February of 2008. Mother stated that Child has never been diagnosed with a genetic connective tissue disorder. Mother maintained that Child plays soccer, basketball, and lacrosse, and periodically suffers knee injuries from those activities. Mother denied ever driving while her license was suspended. (*Id.* at 174-179).

At the conclusion of Mother's rebuttal testimony, the court indicated that it had previously sentenced a man by the name of R.H. for creation of child pornography, solicitation to create child pornography, corruption of minors,

and intimidation of a witness. Based on court documents, the court confirmed that the R.H. convicted of those offenses has a sister, G.H. Thus, the court indicated that the R.H. mentioned in the proceedings as allegedly having a past relationship with Mother is likely the same individual who has been sentenced for sex offenses. As a result of his convictions, R.H. is prohibited from having any contact with minors. The court stated it could take judicial notice of R.H.'s conviction history because it is a matter of public record.

The GAL testified that he interviewed Child for approximately one hour and conducted a few follow-up phone calls with her. In that time, Child expressed her sadness based on her disconnection with Appellant, whom Child regarded as her father for her whole life. The GAL believed Child displayed an authentic emotional response from someone who feels a void in her life based on Appellant's disconnection. The GAL also interviewed Appellant and K.D. Appellant maintained that he does not intend to have a relationship with Child going forward. The GAL opined that it would not be in Child's best interest to disestablish paternity. The court admitted into evidence the GAL's report, over Appellant's objection. (*Id.* at 185-239). Following the GAL's testimony, the court directed the parties to file post-hearing briefs and took the matter under advisement.

On February 18, 2022, the court denied Appellant's request for genetic testing. In doing so, the court found "that the best interest of the child paradigm can, should and must play a predominant role in our decision" and

specifically rejected Appellant's "argument that fraud precludes a consideration of what is best for [Child]." (Trial Court Opinion at 13). Although the court acknowledged that Appellant's "questions about paternity are not irrational[,]" the court stated that its decision would not hinge upon an analysis of fraud. (*Id.* at 18). Rather, the court focused upon Child's best interests, which the court found were served if Appellant remained as Child's legal father. (*Id.* at 19-29). Additionally, the court directed that Appellant's previously escrowed child support payments be released to Mother within ten days.

On February 28, 2022, Appellant filed a motion for reconsideration and to stay/maintain the escrow of support payments pending an appeal. The court denied Appellant's motion for reconsideration on March 8, 2022. With respect to the motion to stay, the court granted relief in part and denied relief in part. Specifically, the court directed the Domestic Relations office to release 50% of all amounts currently held in escrow to Mother for Child's support, and to forward 50% of all future support payments to Mother. The court instructed that the remaining 50% of the escrow fund and support payments should be maintained in escrow.

On March 18, 2022, Appellant timely filed a notice of appeal and a contemporaneous concise statement of errors per Pa.R.A.P. 1925(a)(2)(i).

Appellant presents five issues for our review:

> Whether the trial court erred in finding that Appellant failed to establish fraud by a preponderance of the evidence, and

improperly applied the standard of paternity by estoppel?

Whether the trial court erred in denying Appellant's request for a paternity test and finding that Appellant "is considered the official parent of" the subject child prior to engaging in any factual finding on Appellant's challenge to paternity?

Whether the trial court improperly appointed and admitted the report of a [GAL], where there is no legal authority for such appointment in an action for paternity by fraud?

Whether the trial court erred in denying Appellant's stay of escrowed funds pending this appeal of the paternity action?

Whether the trial court abused its discretion in denying Appellant's request for recusal, when prior to engaging in any finding of fact, the trial judge authored an email showing his bias against Appellant?

(Appellant's Brief at 6).

In reviewing matters of child support and cases involving a question of paternity, we will not disturb a trial court order absent an abuse of discretion. **Vargo v. Schwartz**, 940 A.2d 459, 462 (Pa.Super. 2007).

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough for reversal that we, if sitting as a trial court, may have made a different finding.

**Id.** (quoting **Doran v. Doran**, 820 A.2d 1279, 1282 (Pa.Super. 2003)).

Further:

"The finder of fact is entitled to weigh the evidence presented and assess its credibility." **Smith v. Smith**, 904 A.2d 15, 20 (Pa.Super. 2006). In so doing, the finder of fact "is free to believe all, part, or none of the evidence and we as an appellate court will not disturb the credibility

determinations of the court below." *Id.* (citation omitted).
*Vargo, supra*.

For purposes of disposition, we combine Appellant's first and second issues. In those issues, Appellant argues that the trial court failed to reconcile its conclusion that Mother is at best uncertain about Child's paternity, with Pennsylvania's principle of paternity by fraud. Appellant claims he relied on Mother's statements that he was Child's biological father and did what any "decent man would have done under the circumstances." (Appellant's Brief at 17). Appellant insists that Mother informed him that he was Child's biological father both upon learning she was pregnant and at the time of Child's birth. In fact, Appellant contends that Mother threatened Appellant at the time of Child's birth that if he requested a paternity test and did not sign the acknowledgment of paternity form, that Child would not bear his last name. Appellant submits that he justifiably relied on Mother's assertions that he was Child's biological father and paid child support and acted as Child's father throughout the years based on those representations.

Appellant emphasizes the Ancestry.com testing demonstrates that he and Child have no genetic relationship, whereas the testing showed that G.H. is Child's "close relative." Father concedes he is unsure who Child's biological father is, but he maintains that the Ancestry.com results suggest Child's biological father is an immediate family member of G.H. Appellant highlights G.H.'s testimony that she knew Mother, and Mother was dating R.H. near the

time of Child's conception. Appellant submits that Mother's refusal to admit to sexual relations with another man near the time of Child's conception "should not be given more weight than the substantive and credible evidence [Appellant] produced." (*Id.* at 21). Appellant points out that Child resembles G.H. Appellant further maintains that G.H. suffers from a rare genetic disorder that causes issues with connective tissue and ligaments in joints. Similarly, Child has seen doctors on several occasions for orthopedic issues.

Appellant also contends the trial court ignored other evidence demonstrating Mother's fraud. For example, in 2021, Appellant obtained Child's birth records and learned for the first time that Mother had chlamydia during her pregnancy; Appellant denies ever having chlamydia. Appellant maintains that Mother testified that she contracted chlamydia while dating another man during her pregnancy. Appellant insists that if he knew Mother was sexually active with other men during her pregnancy, he would have insisted on a paternity test immediately after Child's birth.

Appellant insists that he has distanced himself from Child's life since learning of Mother's fraud, no longer holds Child out as his own, and they no longer maintain a parent-child relationship. Appellant further complains the court improperly weighed the credibility of the witnesses. Appellant claims the court failed to consider Mother's untruthfulness, especially in light of Mother's prior conviction involving dishonesty. Appellant also claims the court focused solely on the best interests of Child as it relates to the doctrine of

paternity by estoppel, without any regard for Appellant's claim of fraud. Appellant submits that "[i]njecting the best interest of a child into a paternity by fraud action is like forcing a round peg into a square hole." (*Id.* at 37).

Appellant emphasizes that the court erred by stating he was not entitled to genetic testing simply because he signed an acknowledgment of paternity when Child was born. Appellant asserts that other courts have ordered and utilized the authenticity of genetic tests "to properly flesh out the merits of fraud arguments and to get to the bottom of the truth of the matter asserted, which is what a court is bound to do." (*Id.* at 38). By denying genetic testing, Appellant complains the trial court has invited more litigation. Appellant points out that as Child's legal father, Appellant could take Child at any future time to obtain a private paternity test which will allow Appellant to resurrect his fraud claim with definitive evidence of Mother's untruthfulness, if the results confirm Appellant's suspicions of fraud. Appellant concludes the court erred by rejecting his claim of fraud and denying genetic testing, and this Court must grant relief. We agree that Appellant is entitled to genetic testing under the unique facts of this case.

"The presumption of paternity, *i.e.*, the presumption that a child conceived or born during a marriage is a child of the marriage, …is one of the strongest presumptions known to the law." **Vargo, supra** at 463 (citation omitted). Because the policy underlying the presumption is the preservation of marriages, "the presumption of paternity applies **only** where the underlying

policy to preserve marriages would be advanced by application of the presumption." *Id.* (emphasis in original). Thus, the presumption of paternity is not applicable when there is no longer an intact family or a marriage to preserve. *Id.* If the presumption of paternity is inapplicable, the court must then consider whether the doctrine of paternity by estoppel applies to the facts of the case. *Id.* at 464.

> "Generally, estoppel in paternity issues is aimed at achieving fairness as between the parents by holding both mother and father to their prior conduct regarding paternity of the child." *Buccieri v. Campagna*, 889 A.2d 1220, 1224 (Pa.Super. 2005) (quoting *Freedman v. McCandless*, 539 Pa. 584, 592, 654 A.2d 529, 533 (1995)). This Court has held that the principle of paternity by estoppel is well suited to cases where no presumption of paternity applies. *Gulla v. Fitzpatrick*, [596 A.2d 851, 858 (Pa.Super. 1991)]. The number of months or years a party held out another as the father of a child is not determinative of an estoppel claim. *Id.* "Rather, it is the nature of the conduct and the effect on the father and the child and their relationship that is the proper focus of our attention." *Id.*
>
> Estoppel has been used variously in cases involving paternity and support. *See, e.g., Fish v. Behers*, 559 Pa. 523, 741 A.2d 721 (1999) (holding as between mother and biological father, mother was estopped from asserting paternity of biological father, where she repeatedly assured her ex-husband that he was child's biological father); *Moyer v. Gresh*, 904 A.2d 958 (Pa.Super. 2006) (holding as between putative father and biological father, biological father was estopped from challenging paternity of putative father where putative father raised child for nine years); *Buccieri, supra* (holding biological father was estopped from asserting paternity due to eight-year delay in accepting any responsibility as parent); *J.C. v. J.S.*, 826 A.2d 1, 5 (Pa.Super. 2003)[, *appeal denied*, 576 Pa. 724, 841 A.2d 531 (2003)] (holding putative father was estopped from denying paternity because he continued to act as child's father after his paternity was disproved); *Gulla,*

- 24 -

*supra* (holding as between mother and putative father, mother was estopped from denying paternity of putative father where she had held him out as child's father). Even in the context of a marriage, the principle of estoppel can be applied if fraud occurs. **See also Doran, supra** (holding husband was not estopped from denying paternity of child born during husband's marriage to mother, where she deceived him into believing he was child's biological father); **Kohler**[ **v. Bleem**, 654 A.2d 569 (Pa.Super. 1995), *appeal denied*, 541 Pa. 652, 664 A.2d 541 (1995)] (holding biological father could not assert estoppel to prevent presumptive father from denying paternity, in light of conclusive evidence of paternity, fraud and misrepresentation on issue of true identity of biological father, and absence of intact family).

\* \* \*

"Estoppel in paternity actions is based on the public policy that children should be secure in knowing who their parents are…." **Gebler v. Gatti**, 895 A.2d 1, 3 (Pa.Super. 2006) (citing **Brinkley v. King**, 549 Pa. 241, 701 A.2d 176 (1997)). "The doctrine is designed to protect the best interests of minor children by allowing them to 'be secure in knowing who their parents are.'" **Moyer, supra** (internal citation omitted). The application of paternity by estoppel in any form is very fact specific and must be grounded in a close analysis of the circumstances of the case. **Gebler, supra** (citing **T.L.F. v. D.W.T.**, 796 A.2d 358, 363 (Pa.Super. 2002)); **Matter of Green**, [650 A.2d 1072, 1075 (Pa.Super. 1994)]. The length of time involved is only one circumstance to be considered. **Gulla, supra**. This Court has also considered society's concerns for stability in the child's life, such as whether there is a stable family unit to preserve. **Buccieri, supra**. An additional factor is whether the child's father "is willing to care [for the child]…and capable of doing so…." **Moyer, supra** at 963.

**Conroy v. Rosenwald**, 940 A.2d 409, 416-17 (Pa.Super. 2007).

Additionally, the relevant portion of the statute governing acknowledgments of paternity provides as follows:

**(a) Acknowledgment of paternity.**—The father of a child born to an unmarried woman may file with the Department of Public Welfare, on forms prescribed by the department, an acknowledgment of paternity of the child which shall include the consent of the mother of the child, supported by her witnessed statement subject to 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities). In such case, the father shall have all the rights and duties as to the child which he would have had if he had been married to the mother at the time of the birth of the child, and the child shall have all the rights and duties as to the father which the child would have had if the father had been married to the mother at the time of birth…

\* \* \*

**(g) Rescission.**—

(1) Notwithstanding any other provision of law, a signed, voluntary, witnessed acknowledgment of paternity subject to 18 Pa.C.S. § 4904 shall be considered a legal finding of paternity, subject to the right of any signatory to rescind the acknowledgment within the earlier of the following:

(i) sixty days; or

(ii) the date of an administrative or judicial proceeding relating to the child, including, but not limited to, a domestic relations section conference or a proceeding to establish a support order in which the signatory is a party.

(2) After the expiration of the 60 days, an acknowledgment of paternity may be challenged in court only on the basis of fraud, duress or material mistake of fact, which must be established by the challenger through clear and convincing evidence. An order for support shall not be suspended during the period of challenge except for good cause shown.

23 Pa.C.S.A. § 5103(a), (g) (internal footnote omitted).

Thus, a signed acknowledgment of paternity may be challenged based

upon fraud, duress or material mistake of fact.  23 Pa.C.S.A. § 5103(g).  This

Court has explained the law regarding fraud in this context as follows:

> In **B.O. v. C.O.**, [590 A.2d 313 (Pa.Super. 1991)], this Court stated that "when an allegation of fraud is injected in an acknowledgment of paternity case, the whole tone and tenor of the matter changes.  It opens the door to overturning settled issues and policies of the law."  **B.O.,** [**supra**] at 315.  This Court went on to create a narrow fraud exception for challenging paternity, which is otherwise a settled issue based on the signed acknowledgment.  We adopted the traditional elements of fraud established in Pennsylvania jurisprudence:
>
> > (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result.
>
> **Id.**  Recent cases have moved away from this rigid five-prong test which this Court acknowledged in **B.O.** as problematic and somewhat circular.  [**Id.**]  Our…decision of **Glover v. Severino**, 946 A.2d 710 (Pa.Super. 2008), provides additional guidance as to the elements of fraud in the context of challenges to acknowledgments of paternity:
>
> > A misrepresentation need not be an actual statement; it can be manifest in the form of silence or failure to disclose relevant information when good faith requires disclosure.  Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact **or by silence when good faith required expression**.  Fraud comprises anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether by direct falsehood or innuendo, by speech or silence, word of mouth, or look or gesture.
>
> **Id.** (quotations and citations omitted) (emphasis in original).

In **Glover**, a mother had a brief sexual relationship with a putative father and became pregnant. Despite knowing that she had other sexual partners at the time of conception, the putative father signed an acknowledgment of paternity and paid child support, though his involvement in the child's life was minimal and sporadic. Mother insisted that putative father was the father of the child, despite the results of later testing that revealed he was not. This Court held that despite the mother's strong belief as to the identity of the biological father, her silence on the issue of other possible fathers and her failure to be forthcoming about the true probabilities of paternity constituted fraud by omission.

**R.W.E. v. A.B.K.**, 961 A.2d 161, 168 (Pa.Super. 2008) (*en banc*). **See also**

**N.C. v. M.H.**, 923 A.2d 499 (Pa.Super. 2007) (holding doctrine of paternity by estoppel was inapplicable where appellant operated for over ten years under false pretense that he was child's father due to mother's failure to inform appellant of extramarital affair she had around time of child's conception); **Gebler, supra** (holding trial court erred in applying doctrine of paternity by estoppel where appellant's behavior as responsible father for first eighteen months of child's life was due to mother's concealment of existence of other sexual partners around time of child's conception).

Indeed, this Court has explained:

The presumption that a child born during the marriage is a child of the marriage and the doctrine of paternity by estoppel grew out of a concern for the protection of the family unit; where the unit no longer exists, **it defies both logic and fairness to apply equitable principles to perpetrate a pretense. In this case, application of estoppel would punish the party that sought to do what was righteous and reward the party that has perpetrated a fraud**.

*Doran, supra* at 1283-84 (emphasis added).

In *K.E.M. v. P.C.S.*, 614 Pa. 508, 38 A.3d 798 (2012), our Supreme Court upheld the continued viability of the paternity by estoppel doctrine where the developed record demonstrates that doing so would serve the child's best interests. In analyzing whether the doctrine should apply, the Court indicated that the best interests of the child "remains the proper, overarching litmus, **at least in the wider range of cases**." *Id.* at 525-26, 38 A.3d at 808 (emphasis added). In qualifying its holding, the Court was clear to state that the strongest case of "overriding equities" to overcome application of paternity by estoppel is the "typical fraud scenario (in which a [putative father] is deluded into believing that a child is his own issue)[.]" *Id.*at 525 n.7, 38 A.3d at 808 n.7. While the Court acknowledged that "even in such circumstances, there are arguments to be made that the best interests of a child should remain the predominate consideration," the Court expressly reserved any decision on how the best interests of the child should factor into the analysis of a fraud scenario. *Id.*

Instantly, the parties were never married and there is no intact family unit to preserve. Consequently, the presumption of paternity does not apply here. *See Vargo, supra*. Nevertheless, the trial court applied the doctrine of paternity by estoppel, reasoning that it is "beyond any doubt that [Child's] future life would be better if [Appellant] were to remain as her legal father." (Trial Court Opinion at 19). The court acknowledged that there is a legitimate

question about whether Appellant is Child's biological father; but the court concluded Child's best interests must be the overarching concern.

We are constrained to disagree with the trial court's analysis. Since our High Court's decision in **K.E.M.**, this Court has had occasion to apply its principles to scenarios involving claims of fraud. Recently, in **Hortman v. Hortman**, No. 2352 EDA 2021 (Pa.Super. Sept. 8, 2022) (unpublished memorandum),[2] this Court upheld the trial court's finding of fraud and order granting genetic testing. Although the appellee had held himself out as the child's father, the appellee did so based on the mother's insistence that he was the child's father. In his petition for genetic testing, the appellee presented evidence that another man was the child's biological father. The appellee also underwent private genetic testing, confirming that he was not the child's father.

In rejecting the mother's claim of paternity by estoppel, this Court discerned no abuse of discretion by the trial court in concluding that the mother had perpetrated a fraud upon the appellee by (1) misrepresenting the nature of her 2015 extramarital sexual encounter with another man; (2) her adamant and persistent denial of the possibility that the other man could be child's biological father and her simultaneous ridicule of the appellee when he questioned her about paternity; (3) the mother's intention to induce the

---

[2] **See** Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for persuasive value).

appellee to assume parental responsibility for the child; (4) the appellee's justifiable reliance upon the mother's misrepresentation; and (5) the appellee's financial and emotional damage as a result. **See id.** at 22-23. This Court also noted that the appellee did not continue to hold the child out as his own after discovering that he was not the child's biological father, and that the appellee's contact with the child had ceased.

This Court further held that the mother's reliance on **K.E.M.** was misplaced. In doing so, this Court explained: "In contrast to **K.E.M.**, Appellee in this case raised and proved a claim of fraud. Thus, **K.E.M.** is distinguishable." **Hortman, supra** at 29-30 (citing **Ellison v. Lopez**, 959 A.2d 395, 398 (Pa.Super. 2008) for proposition that even where father/child relationship has been established, evidence of fraud may preclude application of doctrine of paternity by estoppel). This Court went on to state that "if the court estopped Appellee from challenging paternity, it would have punished [the party] who had 'sought to do what was righteous' by assuming parental duty of [the child], and it would have rewarded Mother who 'perpetrated a fraud.'" **Hortman, supra** at 30 (citing **Doran, supra** at 1283-84).

Here, Appellant has presented a colorable claim of fraud. Appellant's evidence of fraud includes, *inter alia* (1) Appellant's actions taken after receipt

of the Ancestry.com results;[3] (2) testimony from Appellant and K.D. that G.H. was a person connected as family to Child via the Ancestry.com results; (3) G.H.'s testimony that Mother and G.H.'s brother, R.H., were engaged in 2008 around the time of Child's conception; (4) the court's judicial notice of the fact that R.H. is a convicted sex offender, which might have provided a motive for Mother to deny a sexual relationship with R.H.; (5) Mother's steadfast refusal to permit Child to undergo genetic testing to protect Child's best interests, which the trial court found incredible based on the minimally invasive testing measures;[4] and (6) Mother's repeated assertions to Appellant that he is Child's biological father, upon which Appellant has relied since Child's birth.

Certainly, if genetic testing confirms that Appellant is not Child's biological father, then he will have successfully proved fraud. In the absence of genetic testing or an admission by Mother to engaging in sexual relations with someone else around the time of Child's conception, however, Appellant will be unable to prove his claim of fraud. While our High Court recognized that "there are arguments to be made that the best interests of a child should remain the predominate consideration" in fraud cases, the Court expressly

---

[3] We reiterate that the trial court did not admit the Ancestry.com results as substantive evidence but only to demonstrate Appellant's state of mind after receiving those results.

[4] (**See** Trial Court Opinion at 16) (stating Mother's "vague proclamation that a blood test 'would be traumatic for my daughter' is simply not credible. Modern genetic tests are simple, easy and almost entirely pain-free").

declined to embrace such a holding. ***See K.E.M., supra*** at 525 n.7, 38 A.3d at 808 n.7. We decline to extrapolate our holding today from the Court's comment in a footnote, which was mere *dicta*. Rather, we hold that to apply the doctrine of paternity by estoppel under the circumstances of this case would punish Appellant, who "sought to do what was righteous" by assuming parental duty of Child, and reward Mother, who might be guilty of perpetrating a fraud. ***See Doran, supra***. ***See also N.C., supra***; ***Gebler, supra***; ***Hortman, supra***.

In so holding, however, we decline to accept Appellant's position that Child's best interests are completely irrelevant in paternity disputes involving claims of fraud. To the contrary, we simply do not hold, as the trial court did, that a child's best interests are elevated over the interests of a party who has been defrauded. The analysis in cases such as these should turn on their unique facts and consideration of all the relevant circumstances, which necessarily includes evidence of fraud **and** the child's best interests. Only in cases where fraud is proven, will the "overriding equities" favor disestablishing paternity, even if doing so would otherwise be against the child's best interests. Based upon the foregoing, we hold that Appellant has put forth sufficient evidence of fraud such that he is entitled to genetic testing to prove his claim.

In his third issue, Appellant argues there is no legal authority in Pennsylvania for the appointment of a GAL in a paternity by fraud action.

Appellant claims the court erred by relying on Pa.R.C.P. 1915.11-2 to make this appointment, as that Rule governs actions for custody, not paternity. Appellant insists the cases on which the court relied as authority to appoint the GAL did not involve claims of fraud, so they are distinguishable. Appellant concludes the court's appointment of a GAL and subsequent admission of his report was improper, and this Court must grant relief. We disagree.

Instantly, on April 27, 2021, the court scheduled a factual hearing for July 20, 2021 and appointed a GAL to assist the court in determining the best interests of Child. The order directed "that [the GAL] conduct an investigation…with respect to whether and/or how [Child] would be affected by a disestablishment of paternity…[and] to issue a written report on this issue on or before July 1, 2021." (Order, 4/27/21, at 1; R.R. at 72). The court further directed that the GAL "shall be prepared to testify regarding his investigation and the conclusions that flow from that investigation. He shall be subject to cross-examination by both parties." (**See id.**) In appointing the GAL, the court stated the GAL "shall represent the best interests of the child in accordance with Pa.R.C.P. 1915.11-2.[5] The GAL shall not act as the child's attorney or represent the child's legal interests as an advocate in [c]ourt." (**Id.** at 2; R.R. at 73). On June 28, 2021, the GAL issued a report indicating that it would not be in Child's best interest to disestablish paternity. Appellant

_____

[5] **See** Pa.R.C.P. 1915.11-2(a) (providing for appointment of GAL to represent best interests of child in **custody action**).

objected to the GAL's testimony and the report.

While we agree with Appellant that Rule 1915.11-2 regarding the appointment of a GAL in custody proceedings is not directly applicable here, we disagree with Appellant's position that the court was prohibited from appointing a GAL under the unique facts of this case. As previously stated, while a child's best interests do not take precedence over a colorable claim of fraud in a paternity by estoppel case, they are not irrelevant, as Appellant suggests. Rather, these types of cases must each be decided on their own unique facts. **See Gebler, supra**. Significantly, Appellant cites no authority that **precludes** a court from appointing a GAL in this context to aid the court's determination in a paternity dispute case. **See, e.g., K.E.M., supra** at 528, 38 A.3d at 809 (explaining that trial court has authority to appoint GAL to advocate child's best interests in paternity dispute); **R.K.J. v. S.P.K.**, 77 A.3d 33 (Pa.Super. 2013), *appeal denied*, 624 Pa. 665, 84 A.3d 1064 (2014) (in which trial court appointed GAL to discern child's best interests in paternity by estoppel case). Therefore, Appellant's third issue merits no relief.

In his fourth issue, Appellant argues the court improperly ordered that the support funds held in escrow should be released to Mother. Appellant claims the court denied his request to stay release of the escrowed funds in part, by ordering that 50% of the funds be released and 50% of future payments to be held in escrow pending appeal. Appellant contends the court's ruling could be irreparable; recovery of those funds will likely involve even

more litigation if this Court reverses the trial court's decision. Appellant concludes the court erred by denying his request to stay a release of the escrowed funds. We disagree.

As a preliminary matter, appellate arguments which are not appropriately developed are waived. *Lackner v. Glosser*, 892 A.2d 21, 29 (Pa.Super. 2006). Here, Mother points out that Appellant cites no legal authority supporting his claim that the court was prohibited from denying Appellant's request for a stay, in part, and keeping some of the child support payments in escrow. (*See* Mother's Brief at 9). We agree with Mother's contention. In his brief, Appellant cites only to Pa.R.A.P. 1701(b)(1), which discusses the effect of an appeal generally, and the trial court's authority to act while an appeal is pending. *See* Pa.R.A.P. 1701(b)(1). Appellant's single citation to this Rule of Appellate Procedure is insufficient to support his claim on appeal, and we deem this issue waived for inadequate development. *See Lackner, supra*. *See also Irwin Union Nat. Bank and Trust Co. v. Famous*, 4 A.3d 1099 (Pa.Super. 2010), *appeal denied*, 610 Pa. 610, 20 A.3d 1212 (2011) (stating this Court will not act as counsel and will not develop arguments on behalf of appellant).

In his fifth issue, Appellant argues the court erred by denying his request for recusal. Appellant asserts the court evidenced its bias against Appellant early in the proceedings, when it authored an e-mail to the parties on March 31, 2021 stating the court was concerned that men might "harass or gain

leverage over women who are the objects of their ire" by alleging fraud. (Appellant's Brief at 44) (citing E-mail dated 3/31/21; R.R. at 41). Appellant insists the court was predisposed to a finding of paternity by estoppel without an analysis of Appellant's fraud claim. Appellant emphasizes that the court offered no comment or judgment on Mother's deceitful conduct. Appellant complains the court summarily denied his recusal motion and did not provide any rationale for its denial until a supplemental opinion authored after Appellant appealed. Appellant contends the court failed to appreciate the gravity of its words in the March 2021 e-mail until **after** Appellant appealed. Appellant claims that based on the court's "assumptive and inflammatory tone" in the March 2021 e-mail, "the die was cast, and [Appellant] had no objective hope that his proof of Mother's fraud would be heard by an openminded jurist." (Appellant's Brief at 47). Appellant concludes the court erred by denying his recusal motion, and this Court must grant relief. We disagree.

Our scope and standard of review are as follows:

> The denial of a motion to recuse is preserved as an assignment of error that can be raised on appeal following the conclusion of the case. We review a trial court's decision to deny a motion to recuse for an abuse of discretion. Indeed, our review of a trial court's denial of a motion to recuse is exceptionally deferential. We extend extreme deference to a trial court's decision not to recuse. We recognize that our trial judges are honorable, fair and competent, and although we employ an abuse of discretion standard, we do so recognizing that the judge himself is best qualified to gauge his ability to preside impartially. Hence, a trial judge should grant the motion to recuse only if a

doubt exists as to his or her ability to preside impartially or if impartiality can be reasonably questioned.

*Interest of D.R.*, 216 A.3d 286, 292 (Pa.Super. 2019), *aff'd*, 659 Pa. 319, 232 A.3d 547 (2020).

"A party seeking recusal must assert specific grounds in support of the recusal motion before the trial judge has issued a ruling on the substantive matter before him or her." *Bowman v. Rand Spear & Associates, P.C.*, 234 A.3d 848, 862 (Pa.Super. 2020) (internal citation omitted). "Recusal is required whenever there is a substantial doubt as to the jurist's ability to preside impartially." *Id.* "However, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 862-63.

Instantly, the court explained its rationale for denying Appellant's recusal motion as follows:

> In this case, this jurist had no prior knowledge or contact with either [Mother] or [Appellant]. Before presiding over the above-referenced case, this jurist had limited experience dealing with the issue of paternity by estoppel and fraud in the context of paternity. Because of this, we solicited legal briefs from the parties. The email sent by this jurist on March 31, 2021 merely advised about a concern of the [c]ourt so that said concern could be addressed in the parties' briefs. At no time in our email did we accuse [Appellant] of any misconduct or improper motive. The third paragraph of the email made clear that this jurist had concerns because he had "encountered men in my years on the bench who would use such a process simply to harass

> or gain leverage over women who are the objects of their ire." It became clear to this [c]ourt as the matter progressed that the motivation of [Appellant] transcended the concern articulated in the March 31, 2021 email.
>
> At no time did this jurist have or display any "bias" against [Appellant]. We confronted a difficult legal question and a unique fact pattern as best we could, and we confronted that question impartially and fairly without bias or prejudice. We understand that [Appellant] disagrees and he can argue his disagreement to Pennsylvania's Superior Court. However, this case should not be decided based upon a spurious recusal motion based upon "bias" that simply did not exist.

(Supplemental Trial Court Opinion, filed 3/31/22, at 6-7). The record supports the court's analysis.

Here, the court held a hearing on March 16, 2021, at which time it expressed its concern that granting Appellant's petition for genetic testing could "open the floodgates" for any father to allege fraud and seek genetic testing upon a separation from the mother. (*See* N.T. 3/16/21, at 4-5; R.R. at 19-20). Notwithstanding the court's concerns, it listened to Appellant's arguments and proceeded in a fair and impartial manner by ordering the parties to brief the relevant legal issues. (*See id.* at 7; R.R. at 21). Specifically, the court indicated that it did not want to hold a hearing to develop Appellant's fraud claim until reading legal briefs on what authority the court had to disestablish paternity after Appellant had already signed an acknowledgment of paternity and held Child out as his own for many years. The court explained to Appellant's counsel: "And it may well be that you're right and I need to do a factual hearing; and if that's so, I'll read your cases;

and I'll set the parameters for that factual hearing." (***Id.*** at 13; R.R. at 26). The court entered an order following the March 16, 2021 hearing, directing the parties to file briefs within 30 days.

Following the hearing, the parties informed the court's judicial assistant via e-mail that they agreed a factual hearing was necessary to resolve the issues at hand. Based on their agreement, the parties sought to dispense with filing pre-hearing briefs and to proceed directly to a hearing instead. In response, the court drafted the March 31, 2021 e-mail, upon which Appellant's recusal motion is based. The e-mail reads:

> Dear counsel—
>
> I have received your emails indicating concurrence that a Factual Hearing is necessary. I will work with the Domestic Relations Office to schedule a date and time for such a hearing.
>
> The above being said, I would still like a Memorandum of Law from both of you. I have looked briefly at the law pertaining to paternity by estoppel. With all due respect, I do not believe it is as clear as you make it out to be. While some factual issues may need to be resolved, I am not willing to entertain a proceeding without being able to establish parameters in advance.
>
> I am concerned about the precedent of enabling a man to obtain a Factual Hearing that could involve questions to a woman about her sexual history. If all a father needs to do in order to open the door to such sensitive topics is allege fraud in a petition, there exists a significant danger of mischief occurring. I have encountered men in my years on the bench who would use such a process simply to harass or gain leverage over women who are the objects of their ire.
>
> Because I would like to know how to set parameters in the

- 40 -

above-referenced case, I still need you to file legal briefs as previously directed. Please focus on the scope of the Factual Hearing I will be conducting. Thank you for understanding my position.

Very truly yours,

[The court].

(E-mail, dated 3/31/21, attached as Exhibit B to Appellant's Recusal Motion, 4/5/21).

Contrary to Appellant's assertions, we see nothing in this e-mail that rises to the level of a "deep-seated favoritism [for Mother] or antagonism [against Appellant] that would make fair judgment impossible." **See Bowman, supra**. Rather, the court reiterated the concerns it expressed at the March 16, 2021 hearing and made clear that it still wanted to review briefs on the legal issues before it, so the court could set parameters for the scope of the hearing. Additionally, when setting parameters for the hearing, the court expressly permitted Appellant "to articulate his theory of fraud. This will necessarily require [Appellant] to provide information regarding his belief that someone else is [Child's] father." (Trial Court Opinion, 4/27/21, at 15). Simply because the court ultimately disagreed with Appellant's position following the hearing, does not mean the court showed bias. On this record, we see no reason to disrupt the court's denial of Appellant's recusal motion. **See Interest of D.R., supra**.

Accordingly, we vacate the portion of the court's order denying Appellant's request for genetic testing and remand for genetic testing such

that Appellant will have an opportunity to prove his claim of fraud. Following the results of the genetic testing, the trial court should proceed as it sees fit under the circumstances. We affirm the court's order in all other respects.

Order affirmed in part, vacated and remanded in part. Jurisdiction is relinquished.

President Judge Emeritus Stevens joins this opinion.

Judge Bowes files a concurring opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/06/2023